**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

FIRST BUSEY CORPORATION,

    PLAINTIFF,

    V.

ALEXI GIANNOULIAS,

    DEFENDANT.

CASE NO. 3:25-CV-50488

HONORABLE IAIN D. JOHNSTON

**MEMORANDUM OPINION AND ORDER**

First Busey Corporation (FBC) has brought this action against Illinois Secretary of State Alexi Giannoulias (Secretary)[1] in his official capacity seeking a declaratory judgment deeming certain procedures related to the collection of the Illinois franchise tax unconstitutional as applied to FBC. The Secretary has moved to dismiss the complaint for both lack of jurisdiction and failure to state a claim on the merits. Dkt. 20. For the following reasons, the motion to dismiss is denied. However, because the Court finds that the *Colorado River* doctrine requires this Court to abstain from deciding the matter—and the *Brillhart-Wilton* doctrine gives the Court the discretion to do so anyway—the matter is STAYED until further notice of the Court, pending the resolution of the concurrent state action in Champaign County Circuit Court.

---

[1] Many of the allegations related to the Secretary began in 2021, which was before Alexi Giannoulias was elected Illinois Secretary of State in 2022, and sworn in in 2023. So, no reasonable inference can be drawn that Alexi Giannoulias' alleged actions as Secretary are based on personal animus. To the contrary, FBC's issues with the Secretary began during the last years of Jesse White's tenure as Secretary. Alexi Giannoulias is sued exclusively in his official capacity and that is how this Court treats this action, as should anybody reading this order.

## I.    Background[2]

### *1994—2021: Historical Context & Origins of the Franchise Tax*

FBC, a Nevada corporation headquartered in Kansas, serves as the holding company for Busey Bank. Complaint [1] at ¶¶ 4, 8. Busey Bank has roots in Illinois dating back to 1868, but it has operated formally as a foreign bank holding company in the state since only 1994. *Id.* at ¶¶ 4, 23. In the State of Illinois—as with most states—corporations such as FBC are required to pay a franchise tax for the privilege of transacting business in the state. *Id.* at ¶ 12; 805 ILCS 5/1.01, et seq.

In Illinois, the franchise tax is collected by the Secretary rather than the Illinois Department of Revenue. Complaint [1] at ¶¶ 13-14. The franchise tax is complex and calculated based on a corporation's "paid-in capital" (PIC). This figure attempts to measure the corporation's assets and revenue attributable solely to Illinois. *Id.* at ¶ 15. Adding to its complexity, there are three distinct types of franchise tax debt, independently triggered by distinct events: (1) an initial franchise tax is payable when a corporation first applies to transact business in Illinois; (2) an annual franchise tax is payable each year; and (3) an additional franchise tax is payable upon cumulative changes (e.g., mergers and acquisitions) that affect a corporation's PIC throughout the year. *Id.* at ¶ 16. The franchise tax has a long history in Illinois, with the legislature most recently acting to gradually repeal the

---

[2] These allegations are taken from the Complaint [1]. The Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

tax in 2019. Illinois then reversed course and reinstated the tax upon a budget shortfall in 2021. *Id.* at ¶¶ 18-22.

From 1994 to 2021, FBC's presence in Illinois grew, and it paid its franchise taxes commensurately, working with experienced legal counsel to make good faith attempts at properly calculating and paying what it owed. *Id.* at ¶¶ 23, 25. In calculating its debt related to mergers during that time, FBC—in accordance with Illinois law and an Illinois Attorney General opinion—used the so-called "aggregation rule," calculating the sums of each merging corporation's PIC pre-merger to identify the PIC of a surviving corporation. *Id.* at ¶ 26. And before 2021, if FBC—or any Illinois corporation—had questions related to the calculation of its franchise tax, the Secretary was accommodating and would assist corporations in calculating its franchise tax debt. *Id.* at ¶¶ 28-30. At various times, representatives of the Secretary would describe the process used for calculating the franchise tax and even show their work to FBC. *Id.* at ¶¶ 29-31. These calculations—as well as express representations—demonstrated the Secretary's use of the aggregation rule. *Id.* at ¶ 31.

### *2021—Present: A Change in Practices & Application to FBC*

In 2021, after the legislature about-faced on the intended repeal, the Secretary dramatically changed how it calculated the franchise tax. *Id.* at ¶ 33. In September 2021, the Secretary (then Jesse White) sent FBC a series of interrogatories related to its acquisition of Cummins-American Corporation. *Id.* at ¶ 34. The Secretary questioned FBC's calculation of the allocation factor, and it further requested FBC's

3

recent federal tax returns and other supporting documentation. *Id.* FBC responded to this request in October 2021, then submitted its annual franchise tax payment to the Secretary in April 2022. *Id.* at ¶¶ 35-36. But the Secretary didn't accept the payment and instead sent FBC a notice of delinquency. *Id.* at ¶ 36. The Secretary later stated that the delinquency notice was sent in error; however, it became clear during subsequent conversations that the Secretary was now advocating new methodologies to calculate the franchise tax which were inconsistent with decades of precedent. *Id.* at ¶¶ 37-38. The new methodologies being advanced by the Secretary significantly changed its views on (1) PIC, (2) the statute of limitations, and (3) the allocation factor. *Id.* at ¶ 39.

First, with respect to PIC, rather than following the aggregation rule, the Secretary now advocated for PIC to be based on Generally Accepted Accounting Principles (GAAP). *Id.* at ¶ 40. As a result, it requested FBC's tax returns dating back to 2004. *Id.* The Secretary then recalculated FBC's PIC as more than double the PIC that FBC had previously reported. *Id.* at ¶ 41. FBC believed that this approach—and the Secretary's attempted enforcement of the change—was inconsistent with established Illinois law, Illinois case law, the forementioned Illinois Attorney General opinion, basic principles of administrative law, and longstanding treatises on the subject.[3] *Id.* at ¶¶ 42-46.

---

[3] This statement—and any other legal conclusion advanced by FBC in the complaint—is considered only to the extent it advances FBC's version of events leading up to the complaint. Legal conclusions are not accepted by the Court as true and the Court makes no finding that FBC's legal averments are correct.

Next, related to the statute of limitations, FBC also saw the Secretary's new view on retroactive enforcement of this tax debt as contrary to Illinois law. *Id.* at ¶¶ 48-49. According to FBC, rather than using a seven-year statute of limitations found in § 15.90 of the Business Corporation Act of 1983 (BCA), the Secretary is asserting that this seven-year limitation applies only to the *annual* franchise tax, and not to any initial or additional franchise tax debt owed. *Id.* at ¶ 51; 805 ILCS 5/15.90.

So, the Secretary first requested FBC resubmit documents dating back to 2004. Complaint [1] at ¶ 52. When FBC declined to resubmit these forms—reporting that it viewed signing forms contrary to settled law as potentially subjecting its signatory to perjury—the request for documents was extended back to 1994. *Id.* Moreover, the Secretary is now demanding additional payment from FBC for its annual franchise tax payments dating back to 2011—despite agreeing those debts are subject to a seven-year statute of limitations—citing unrelated and previously resolved notices of minor discrepancies and miscalculations as a basis for the state to extend the statute of limitations. *Id.* at ¶ 53.

Finally, as it relates to the allocation factor, FBC's operating subsidiary, Busey Bank, is itself statutorily exempt from the franchise tax. *Id.* at ¶ 56. In theory, the Busey Bank stock certificate is held by FBC outside the State of Illinois. *Id.* at ¶ 61. This acts to shield Busey Bank's customers from both FBC's debt and its non-banking activities, as well as to more effectively facilitate FBC's acquisitions and lessen its franchise tax liability. *Id.* at ¶¶ 57, 61. Then, the allocation factor is designed—still

5

in theory—to account exclusively for those activities FBC is conducting *in* Illinois (i.e., not in Nevada, Kansas, or elsewhere). *Id.* at ¶ 55.

But due to a clerical error following a request for the stock certificate from an Illinois lender, the stock certificate was inadvertently held by FBC in Illinois from 2010 to 2021. *Id.* at ¶ 63. As a result, the Secretary is now alleging that FBC's allocation factor is nearly 100%. *Id.* at ¶ 64. Busey Bank has itself already paid millions in annual regulatory fees to the Illinois Department of Financial and Professional Regulation (IDFPR). *Id.* at ¶ 56. To charge a near-100% allocation factor to FBC now via enforcement action would effectively double tax FBC's revenue, assessing liability within both the franchise tax payable to the Secretary and regulatory fees payable to the IDFPR. *Id.* at ¶¶ 55, 58, 62.

### *Franchise Tax Amnesty & Roadblocks*

Although FBC would ordinarily be able to apply for franchise tax amnesty, it alleges more wrongdoing on the part of the Secretary's office to prevent this. As alleged, the Secretary lobbied the Illinois legislature to exempt FBC—and any taxpayer involved in a civil, criminal, or administrative investigation—from seeking franchise tax amnesty. *Id.* at ¶¶ 78-81. Moreover, the Secretary denied FBC's request for meetings or calls, failed to respond promptly to correspondence, and threatened to revoke FBC's ability to conduct business in the State of Illinois. *Id.* at ¶¶ 65-66, 70; *see also below at Relevant Post-Complaint Developments*. This occurred despite FBC's attempts to cooperate with the Secretary. *Id.* at ¶¶ 67-69, 71.

6

***Administrative Proceedings & Due Process***

In June 2025, the Secretary notified FBC that its internal hearing division would hold a hearing on FBC's franchise taxes in August 2025. *Id.* at ¶¶ 83, 85. Such administrative hearings are exceedingly rare. *Id.* at ¶ 105. Although this was the first such hearing in 2025, FBC received two months' notice. *Id.* The stated purpose of the hearing was "to ascertain the required amount" FBC owed the Secretary in franchise taxes, penalties, interest, fees, and charges. *Id.* at ¶ 84. The Secretary sought an undetermined amount exceeding $28 million. *Id.* at ¶ 86. The exact amount was not originally provided to FBC; however, the Secretary now reportedly seeks franchise back taxes in the *preliminary* amount of $10,642,406.30; interest in the amount of $17,497,778,81; and penalties in the amount of $250,789.16, while maintaining that this is not a final determination of an amount owed. *Id.* at ¶ 87. Approximately 62.5% of the total bill is in interest and penalties accrued at a rate of 24% interest per annum, a rate that would subject an individual lender to criminal liability in the State of Illinois. *Id.* at ¶¶ 88-90.

FBC argues that the Secretary needs to calculate the actual and final amount owed and provide FBC with written notice of that amount due; rather than defer that finding to an administrative hearing officer, which restricts FBC's legal remedies and amounts to a violation of FBC's constitutional right to due process. *Id.* at ¶¶ 93-96. Meanwhile, the Secretary refuses to engage in settlement negotiations without FBC refiling decades worth of its tax forms, which FBC continues to refuse to do under the assertion that doing so could amount to perjury. *Id.* at ¶ 98.

Finally, in the context of the administrative hearing itself, FBC takes umbrage with both the administrative hearing counsel for the Secretary and the hearing officer himself. *Id.* at ¶¶ 101-105; 113. First, counsel for the lead partner on the matter for the Secretary is married to the longtime case manager for Busey Bank at the IDFPR, presenting an alleged conflict of interest. *Id.* at ¶¶ 101-105. Moreover, the Secretary's office has allegedly hand-selected its own for-hire hearing officer who currently acts as a mediator and arbitrator for private parties—as well as adjudicating driving privilege disputes for the Secretary—and is alleged to be ill-suited to manage a multi-million-dollar tax controversy. *Id.* at ¶ 113.

### *Federal Complaint for Declaratory Judgment*

FBC has brought four claims against the Secretary in his official capacity, each seeking solely a declaratory judgment. FBC contends that the Secretary violated its Fourteenth Amendment right to due process by the nature and structure of the contested administrative hearing (Count I); violated its Fourteenth Amendment right to due process by the denial of written notice of the amount allegedly owed (Count II); violated its Fourteenth Amendment right to due process by attempting to collect tax liability long time-barred by the applicable statute of limitations (Count III); and violated its Eighth Amendment right to be free from excessive fines by attempting to collect punitive and grossly disproportionate interest and penalties (Count IV). *Id.* at ¶¶ 107-155.

8

The Secretary has moved to dismiss the complaint using a kitchen sink theory of motion practice.[4] The Secretary's attorneys make six arguments: (i) that FBC lacks an injury in-fact—and therefore lacks standing to bring its claim; (ii) that FBC's claims are not ripe; (iii) that the declaratory relief sought by FBC is barred by the Tax Injunction Act; (iv) that the *Younger*, *Wilton-Brillhart*, and *Colorado River* abstention doctrines either require or permit the Court to abstain from this action; (v) that "principles of federalism and comity" necessitate abstention; and (vi) that FBC fails to state a claim by both claim-splitting and by not adequately alleging due process violations. Memorandum Supporting Motion to Dismiss [21] at 2.

### *Relevant Post-Complaint Developments*

The same day FBC filed this complaint in federal court, it filed a complaint in the Circuit Court of the Sixth Judicial Circuit Court of Illinois in Champaign County, Illinois. *Id.* at ex. 1, Case No. 2025-MR-283. Within 24 hours of the complaints being filed in both courts, the Secretary allegedly revoked FBC's authority to transact business in Illinois.[5] *Id.* at ex. 1, ¶ 179. FBC then amended its complaint in state court.[6]

---

[4] The Court is no fan of kitchen-sink pleadings. *See, e.g., Groves v. R.C. Bremer Mktg. Assocs.*, 22-cv-50154, 2024 U.S. Dist. LEXIS 188118, at *4 n.1 (N.D. Ill. Oct. 16, 2024). That dislike is equally applicable to motion practice. But the Court recognizes that the Secretary's counsel has an ethical duty to raise subject-matter jurisdiction issues. *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 873 (N.D. Ill. 2023). So, the Court in no way bellyaches about those arguments.

[5] The import of such a revocation is largely unclear to the Court. To its knowledge, no Busey Bank branch in the State of Illinois has shuttered due to the revocation.

[6] The Court can take judicial notice of the related state-court proceedings. *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 697 n.4 (7th Cir. 1985); *Pavlock v. Holcomb*, 532 F. Supp. 3d 685, 690 n.3 (N.D. Ind. 2021).

That amended state court complaint brings nearly identical factual allegations to the instant federal complaint but seeks distinct relief. *Id.* at ex. 1, ¶¶ 108-188. In the state court action, FBC is seeking injunctive relief and declaratory judgments that: (i) FBC is a "banking corporation" and is therefore exempt from the franchise tax; (ii) FBC doesn't "transact business" in Illinois and is therefore exempt from the franchise tax; (iii) that the aggregation rule is the appropriate method for calculating PIC in the case of a statutory merger; (iv) that the Secretary's attempts to collect franchise tax debts is subject to a seven-year statute of limitations; (v) that the Secretary has failed to comply with the Illinois Administrative Procedure Act (APA); (vi) that the Secretary has failed to comply with the APA's rulemaking requirements in changing its rule regarding the calculation of the PIC in the case of a statutory merger; and (vii) that the Secretary has failed to comply with the BCA to revoke FBC's authority to transact business in Illinois, making the revocation void *ab initio*. *Id.*

But FBC now also avers uncertainty as to its ability to maintain this state action—or any appeal of the administrative action—citing statutory authority for the proposition that a revoked corporation is not "permitted to maintain a civil action in any court of this State." FBC's Response [28] at 6; 805 ILCS 5/13.70(a).

## II.    Standing & Ripeness

### *Legal Standards*

Federal courts are limited to deciding only actual "Cases" or "Controversies." U.S. Const. art. III § 2. Article III standing is an essential element to federal subject-

10

matter jurisdiction that courts are duty-bound to address at the outset of an action. *Bazile v. Finance Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *see also In re Deere & Co.*, 703 F.Supp. 862, 873 (N.D. Ill. 2023). At the pleading stage, the plaintiff need not prove it has standing, but it must allege facts sufficient to plausibly allege standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Collier v. SP Plus Corp.*, 889 F.3d 894, 896-97 (7th Cir. 2018) (references to "actual damages" insufficient).

Three requirements are necessary for Article III standing: first, the plaintiff must have an injury in-fact: an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; second, there must be a causal connection between the injury and the conduct complained of: the injury must be fairly *traceable* to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and third, it must be likely—as opposed to merely speculative—that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Id*. at 560 n.1. And an injury is concrete if it is "real," not abstract. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). "Concrete" injuries are not always synonymous with "tangible." *Id*. The concreteness requirement examines the substance of a plaintiff's asserted injury; contrastingly, the imminence requirement measures its likelihood. *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023). To provide a basis for standing in federal court, an injury must exist "in both a

qualitative and [a] temporal sense." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Allegations of *possible* future injury are insufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore*, 495 U.S. at 158).

In defining imminence, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923). "[T]hreatened injury must be *certainly impending* to constitute injury in fact[.]" *Clapper*, 568 U.S. at 409. Alternatively, standing can be based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm. *Clapper*, 568 U.S. at 414 n.5 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010)); *see also Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) (standing to challenge an ordinance when it's not "unadorned speculation" that it will be enforced against plaintiffs); *Blum v. Yaretsky*, 457 U.S. 991, 1000-01 (1982) (standing to challenge the procedural adequacy of the threat of nursing home initiated discharges to lower levels of care); *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (standing to make pre-enforcement challenge to provisions regulating election procedures, among other provisions, when they presented inescapable delays and precluded prompt participation).

In the context of the Eighth Amendment, the government is restricted only from *extracting* payments—"in cash or in kind"—as punishment for some offense. *Simic v. City of Chicago*, 851 F.3d 734, 740 (7th Cir. 2017) (quoting *United States v. Bajakajian*, 524 U.S. 321, 328 (1998)); *see also Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (incorporating the Eighth Amendment against the States by the Due Process

Clause of the Fourteenth Amendment). The form of the fine is irrelevant. *von Hofe v. United States*, 492 F.3d 175, 182 (2d Cir. 2007). The extraction may take the form of forfeiture. *Austin v. United States*, 509 U.S. 602, 604 (1993).

And in declaratory judgment actions, the case or controversy question boils down to "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Simic*, 851 F.3d at 740 (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)). On the other hand, an "abstract dispute about the law, unlikely to affect these plaintiffs any more than it affects other Illinois citizens" doesn't rise to the level of controversy required by Article III. *Alvarez v. Smith*, 558 U.S. 87, 93 (2009). Likewise, mere participation in proceedings imbued with due process—or bare procedural violations—don't give rise to a concrete injury, unless and until it affects "some concrete interest." *Sherwood v. Marchiori*, 76 F.4th 688, 695 (7th Cir. 2023); *Alexander v. McKinney*, 692 F.3d 553, 557 n.2 (7th Cir. 2012); *Spokeo*, 578 U.S. at 342.

Beyond a plaintiff having standing to bring its claims, any case or controversy brought in federal court must also be ripe for decision. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Horsley v. Trame*, 808 F.3d 1126, 1129 (7th Cir.

13

2015) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 806 (2003)). The doctrine is primarily concerned with preventing a court from making adjudications based on events that may not occur as anticipated, or even at all. *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). Ripeness turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Devs. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148-49 (1967)).

### *Analysis*

The complaint alleges facts sufficient to plausibly maintain Article III standing. Moreover, the controversy is ripe for hearing in the federal courts.

### *i.*    *Standing*

As alleged, FBC is apparently on the hook for more than $28 million. They have received this preliminary amount in a hearing notice. In seeking to ostensibly *eventually* collect this money, the Secretary, as *alleged*, has actively subjected FBC to a nearly five-year long administrative process, exceeded the statute of limitations while doing so, and attempted to collect exorbitant interest in violation of the Eighth Amendment. The Secretary imminently intends to collect on this debt, as evidenced by its recent revocation of FBC's right to conduct business in Illinois. These allegations constitute an actual and concrete injury in fact, traceable to the Secretary

14

and redressable by a decision in FBC's favor. The Court will focus on the nature of FBC's injury as the only factor of standing in dispute.

FBC hasn't yet suffered a tangible loss, such as money, because it hasn't yet paid the Secretary. But that doesn't mean it hasn't lost a concrete property interest in its money. At this point—five years into what's been adequately pled as a rare and defective process with no end in sight—financial harm has clearly been brought upon FBC. Although it's not "literally certain" that the financial harms FBC identifies will come to fruition—in essence, it's not "literally certain" FBC will one day pay $28 million—this isn't the uniform standard required for a plaintiff to have standing. *Clapper*, 568 U.S. at 414 n.5. A "'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm," is sufficient. *Id.* (quoting *Monsanto*, 561 U.S. at 153-54). By now, there's more than a substantial risk that FBC will lose a property interest in its money through these proceedings. Even evaluating the claims under the more demanding "certainly impending" standard, FBC clears this bar too. The Secretary revoked FBC's license to operate a business within a day of this complaint being filed. That action alone speaks volumes about certainly impending financial loss, and the license itself—as argued by FBC—probably presents a concrete interest on its own. FBC Response [28] at 6 n.4; *see also Kress v. New Jersey*, 455 Fed. Appx. 266, 270 (3d Cir. 2011); *Wis. Bankers Ass'n v. Robertson*, 190 F.Supp. 90, 94 (D.D.C. 1960); *Upper Hudson Planned Parenthood, Inc. v. Doe*, Case No. 90-CV-1084, 1991 U.S. Dist. LEXIS 13063 at *16-17 (N.D.N.Y. Sept. 12, 1991).

FBC's injury isn't purely procedural, nor does it allege bare procedural violations. FBC hammers this point home in its response. FBC Response [28] at 4-6. FBC adequately alleges an infringement of its constitutional rights affecting its concrete property interest in its money. Although FBC draws parallels to the Seventh Circuit's decision in *Sherwood*, this case presents an even simpler question. There, unemployment claimants had standing to bring a due process claim related to unemployment benefits by attaching a deprivation of procedural due process to their concrete property interest in unrealized unemployment benefits. *Id.* at 695. Here, the extra step is unnecessary. The allegedly defective due process of the Secretary *directly* infringes the concrete property interest FBC asserts in its money.

Indeed, to hold otherwise would be to permit a kind of extortion through due process: the State could have an unconstitutional process but wait years—if not decades—to fully and completely employ it; all the while amassing penalties and interest that will eventually come home to roost, when the State—and only the State—says so. Such a case undeniably presents a unique case given the need for an injury to have both "qualitative and temporal" elements. *Dinerstein*, 73 F.4th at 511. A suit filed one day after interrogatories were sent in 2021 is insufficient qualitatively to implicate a concrete financial interest. On the other hand, if interrogatories come, then twenty years pass without so much as a letter in the mail informing a plaintiff that someone is coming for it, it can't be fairly said that plaintiffs are suffering actual or imminent financial injury in the temporal sense, nor that there is any "substantial risk" of injury. This matter presents the middle ground. A significant amount of the

$28 million presently owed includes interest and penalties accumulated over the last five years of allegedly defective process. Thousands more accrues each day. Yet, as alleged, the Secretary has not forgotten about its money. It wants the money it thinks is owed, badly enough to revoke a large corporation's license to do business over it. FBC's financial loss is both sufficiently certain and certainly impending. The allegations present a controversy sufficient to provide the federal courts with jurisdiction.

Likewise, in the Eighth Amendment context, though the government hasn't yet "extracted" the money in cash, it has, based on the allegations, begun extracting the money "in kind." *Simic*, 851 F.3d at 739; *Bajakajian*, 524 U.S. at 328. FBC has been subjected to increasingly hostile governmental intervention and has most recently seen its license to do business in the State of Illinois revoked. This kind of civil act is a clear effort to extract the allegedly unconstitutional fines, even if not yet successful. At the very least, it's enough to survive a motion to dismiss.

FBC may not have yet been "found liable for delinquent franchise taxes … ordered to pay them by the presiding hearing officer … [nor] paid any amount toward delinquent franchise taxes, penalties, or interest." Memorandum Supporting Motion to Dismiss [21] at 6. But that's *despite*—by the face of the complaint—FBC suffering actual concrete financial injury by the hands of the allegedly defective process that hasn't even yet given FBC a bill *to* pay but has still revoked its ability to conduct business in Illinois, all the while continuing to accrue allegedly unconstitutional interest. Each day that passes adds more to this allegedly unconstitutional bill. This

is more than abstract conjecture and presents enough at this stage. Taking the facts in a light most favorable to FBC, an actual controversy exists. The Court possesses Article III standing to hear the dispute.

### ii. Ripeness

Related to ripeness, actions seeking a declaratory judgment are by their nature designed to prevent future litigation, permitting prompt resolution of actual controversies. *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 711 (7th Cir. 2002). The entire purpose of the tool is to declare the rights and obligations of the parties and govern the parties' relationship in the future. *Id.* That the future may include litigation and/or administrative enforcement is more reason to find a substantial controversy, not reason itself to find a declaratory action unripe. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 n.7 (2007). Indeed, such flawed logical reasoning would quickly render the Declaratory Judgment Act useless (nugatory, even), as any party who could hypothetically be embroiled in future litigation could then be ejected from federal court for their controversy not being far enough along. *Id.* at 133-34.

Certainly, this doesn't mean that every declaratory judgment action is ripe. Again, FBC is not challenging the tax itself, but the constitutional fortitude of the Secretary's procedure. FBC Response [28] at 4. To use the same hypothetical as above, a corporation couldn't seek a court's declaratory judgment one day after receiving administrative interrogatories. It wouldn't have standing and the controversy wouldn't be ripe. For many of the same reasons described above, however, this isn't the case here. FBC alleges having been subjected to defective process for

18

nearly five years. Although there may not be a bright line rule in time for when an action becomes ripe, taking the allegations in a light most favorable to FBC, this action is squarely on the side of being ripe for decision.

### III.    Stating a Claim & Claim-Splitting

#### *Legal Standards*

If the Court has the requisite jurisdiction to hear a case, Federal Rule of Civil Procedure 8 requires only that a complaint contains a short and plain statement establishing the basis for the claim and the Court's jurisdiction, as well as a prayer for the relief sought. Fed. R. Civ. P. 8(a). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Dismissal is proper when "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* at 558. The Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). The Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 578 (7th Cir. 2009). The Court may also consider exhibits attached to the complaint and documents other than the complaint "when they are referenced in the complaint and central to the plaintiff's claim." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 n.1 (7th Cir. 2013). The moving party bears the burden of establishing the insufficiency of the plaintiff's allegations. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

19

The doctrine of claim-splitting is "related, but distinct from" the doctrine of claim preclusion. *Scholz v. United States*, 18 F.4th 941, 951 (7th Cir. 2021). A suit is duplicative if the "claims, parties, and available relief do not significantly differ between the two actions." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 889 (7th Cir. 2012) (quoting *Ridge Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 572 F.Supp. 1210, 1213 (N.D. Ill. 1983)). Claim-splitting is a subset of the *res judicata* doctrine and essentially forbids plaintiffs from taking two bites at the apple. *Carr v. Tillery*, 591 F.3d 909, 913-14 (7th Cir. 2010); *Bell v. Taylor*, 827 F.3d 699, 707 (7th Cir. 2016). A practical difference between the doctrines, however, is that claim-splitting results in purely discretionary dismissal; whereas, dismissal is mandatory when *res judicata* applies. *Cooper v. Retrieval-Masters Creditors Bureau, Inc.*, 42 F.4th 688, 697 (7th Cir. 2022).

### Analysis

FBC has sufficiently stated a claim for the deprivation of due process to survive a motion to dismiss. Furthermore, its litigation strategy doesn't amount to claim-splitting.

First, taking the allegations in a light most favorable to FBC, it's sufficiently stated a claim for due process violations. It adequately alleges a failure to ensure a fair and unbiased process in Count I, a failure of the Secretary to provide it an amount owed in Count II, and a disregard of the statute of limitations in Count III.[7]

---

[7] The Secretary doesn't address the alleged Eighth Amendment violation of Count IV in this section of its motion to dismiss.

The Secretary's arguments largely put the cart before the horse, arguing its hearing officer is entitled to a presumption of impartiality. But, as it admits, the government must provide a "sufficiently neutral and impartial" decisionmaker. *Montoya v. Jeffreys*, 99 F.4th 394, 401 (7th Cir. 2024); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (describing the entitlement as an "impartial and disinterested tribunal"). Although it's also correct that hearing officers are entitled to presumptions, this isn't a matter appropriate for decision on the face of the complaint The face of the complaint alleges that the administrative law judge would have reason to rule in favor of the Secretary. The Court will accept this allegation as true, as it must. Moreover, related to Counts II and III, this action is not one of state law, but of federal constitutional law. An argument that the complaint improperly alleges violations of state law procedures misstates the claim completely. *See, e.g.,* Complaint [1] at ¶¶ 95-96, 122-125 (alleging state law violations that are violating FBC's federal constitutional rights).

Next, FBC's decision to file simultaneous actions in state and federal court surrounding the same universe of facts isn't claim-splitting. Although the doctrine discourages two bites at the apple, FBC here is taking two separate, distinct bites at two separate, distinct apples. The claims in state court involve state statutory interpretation, while the claims in federal court seek to adjudicate federal constitutional rights under the Eighth and Fourteenth Amendments. This strategy—

if continued after this Order—may come back to bite FBC in the long run.[8] But it's not enough to dismiss the action from the jump.

FBC's complaint must merely state a claim that is "plausible on its face." *Twombly*, 550 U.S. at 570. It has done so.

## IV. Declaratory Judgment Act & Tax Injunction Act

### *Legal Standards*

Declaratory judgments are a relatively new addition to a litigant's toolbox. The Declaratory Judgment Act, first passed in 1934, permits this relief:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 … [other exceptions omitted]… any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201

Although the Declaratory Judgment Act enlarged the statutory jurisdiction of the federal courts, it couldn't and doesn't enlarge the jurisdiction conferred upon them by Article III, nor could it empower the courts to provide advisory opinions. *People ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 941 (7th Cir. 1983). Moreover, the breadth of controversies that may receive a declaratory judgment are limited by the face of the statute, other federal statutes, and by Supreme Court precedent. Although state tax controversies are not explicitly prohibited, another statute—the

---

[8] *See below* at n.11.

Tax Injunction Act of 1937—significantly limits the power of federal declaratory judgments to act upon state tax enforcement:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341

Despite its name, the Tax Injunction Act prohibits federal courts from entering declaratory judgments as well as injunctions on state tax matters. *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982). To determine whether a "plain, speedy and efficient" remedy is available in state courts, the federal court looks to ensure that a state-court remedy meets certain *procedural* requirements, not substantive. *Ghelf v. Town of Wheatland*, 132 F.4th 456, 467 (7th Cir. 2025); *Rosewell v. LaSalle Nat. Bank*, 450 U.S. 503, 512 (1981). Clues that may indicate a procedurally sound state court remedy include the ability to assert federal rights, the appealability of findings—ultimately to the United States Supreme Court if needed—and whether "a full hearing and judicial determination of the controversy" is available at the state court setting. *Id.* at 512-15 (quoting S. Rep. No. 701, 72d Cong., 1st Sess. at *2 (1932)); *see also Tully v. Griffin, Inc.*, 429 U.S. 68, 74 (1976); *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300-01 (1943).

Specifically, "plain" requires a plaintiff to show the challenged procedure is "uncertain or otherwise unclear." *Rosewell*, 450 U.S. at 516-17. "Speedy" is "perforce a relative concept, and we must assess the … delay against the usual time for similar

litigation." *Id.* at 518. And "efficient" requires a remedy not manifest itself in "ineffectual activity or an unnecessary expenditure of time or energy." *Id.*

### *Analysis*

Remaining still in the universe of stating a claim, it's premature to dismiss this action for being barred by the Tax Injunction Act.

Facially, the Tax Injunction Act would seem to be implicated by this action. Intuitively, a declaration from this Court that the administrative processes being used by the Secretary are procedurally unconstitutional at the federal level would seem to "restrain" the assessment of the state franchise tax. 28 U.S.C. § 1341. But existing statutory interpretation from higher courts—construing the Tax Injunction Act language narrowly—makes this a trickier question than it would appear at first glance. *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 12-13 (2015); *Hibbs v. Winn*, 542 U.S. 88, 107-08 (2004). Nevertheless, the Court need not reach that question today, because it's enough to say that it's adequately alleged that a "plain, speedy and efficient remedy" is unavailable in the state courts.

The face of the complaint would seem to argue against a finding of a "plain, speedy and efficient" procedurally-sound remedy available in the state courts. The Secretary argues that "[o]nce the administrative proceedings are complete, [FBC] may seek review of [the Secretary's] decision." But it's been nearly five years since the Secretary began its investigation into FBC, and they've only just now even *begun* formal administrative proceedings. Five years without receiving even a final delinquent tax bill due would seem to undercut the proposition that a "speedy"

24

remedy is available through those internal proceedings, notwithstanding the fact that this action exists in part *because* FBC alleges these administrative proceedings are procedurally defective. If five years turns out to be the "usual time for similar litigation," then this will be a matter resolved during further discovery. *Rosewell*, 450 U.S. at 518.

Likewise, the state court injunctive and declaratory remedy currently being pursued by FBC in Champaign County Circuit Court can't be seen as "plain" at this juncture.[9] As articulated by FBC, there is concern that it will lack the ability to maintain a suit—either an administrative appeal or the simultaneous declaratory action—in the State of Illinois with a now-revoked license to conduct business. FBC Response [28] at 9; 805 ILCS 5/13.70(a). The Secretary replies, averring it has not and does not intend to raise this statute as an affirmative defense in the state court proceedings. Secretary Reply [29] at 9.

But even taking the Secretary at its word, the Court is not prepared to state that the State's declaration in the form of a reply brief settles the matter today, particularly with a dubious legal foundation as to whether the defense is waivable in the first place. *See* FBC Surreply [33] at 2.[10] The face of the statute, combined with the Secretary's revocation within a day of the suit being filed, understandably raises concerns with FBC. It's too early at this stage to determine whether the state court

---

[9] The state court matter ongoing in Champaign County wasn't raised as an available state court remedy by the Secretary in its motion to dismiss and could be considered waived for the purpose of this motion. It's discussed nonetheless for the sake of completeness.

[10] The Court also questions the ability of assistant attorneys general to bind the Secretary to this litigation strategy. *See, e.g., Marz v. State*, 519 N.E.2d 82, 84 (Ill. App. Ct. 1988).

remedy is "plain, speedy and efficient" to FBC.[11] So, the matter won't be dismissed at this stage for being barred by the Tax Injunction Act.

## V.      Abstention & Discretion

Federal courts have the power to enforce the federal Constitution against state legislative action. *Ex Parte Young*, 209 U.S. 123, 159 (1908). And the Court "must take jurisdiction if it should." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821). But that doesn't mean the Court always can or should exercise such power and the Supreme Court has recognized several doctrines requiring or granting discretion for a court to abstain from hearing an action. *Id.*; *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288-90 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494-95 (1942); *Younger v. Harris*, 401 U.S. 37, 50-54 (1971); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813-17 (1976); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1071-72 (7th Cir. 2018); *and* 17A Charles Alan Wright et al., *Federal Practice and Procedure* § 4241 (4th ed. 2016) at 289-92. Though ripeness and abstention doctrines are "closely mingled" and analyses often blend, they're distinct questions of law. *Crane v. Fauver*, 762 F.2d 325, 328 (3d Cir. 1985).

Having decided that the Court *can* hear the case and that FBC has adequately stated a claim upon which relief may be granted, the question now becomes whether

---

[11] Of course, should the state court remedy be later found by this Court to be "plain, speedy and efficient," and the Tax Injunction Act deemed to apply (i.e., that FBC's actions are indeed seeking to restrain the assessment of a state tax), FBC may well be foreclosed from bringing its federal constitutional claims in state court. The state court remedy need not be the *best* remedy available to still foreclose a plaintiff's federal remedies via the Tax Injunction Act. *ANR Pipeline Co. v. La. Tax Com'n*, 646 F.3d 940, 947 (5th Cir. 2011). Furthermore, failure to take advantage of available remedies in the state court is not a viable defense. *Sacks Bros. Loan Co., Inc. v. Cunningham*, 578 F.2d 172, 175 (7th Cir. 1978).

the Court *should* hear the case. Although *Younger* abstention is presently inapplicable, the *Colorado River* doctrine requires the Court abstain from this matter pending the resolution of the concurrent state court matter pending in Champaign County Circuit Court. Even if *Colorado River* didn't apply, the Court would still exercise its discretion to abstain under the *Wilton-Brillhart* doctrine.

### i. *Younger*

#### a. *Legal Standard*

First, *Younger* ordinarily requires federal courts to refrain from exercising jurisdiction over federal constitutional claims that seek to interfere with or interrupt ongoing state proceedings. *Younger*, 401 U.S. at 53-54; *Courthouse News*, 908 F.3d at 1071. In civil cases, *Younger* extends "only to a federal suit filed by a party that is the target of state court or administrative proceedings in which the state's interests are so important that exercise of federal judicial power over those proceedings would disregard the comity between the states and federal government." *SKS & Assocs., Inc. v. Dart*, 619 F.3d 674, 678 (7th Cir. 2010) (collecting cases).

More formulaically, when ongoing state proceedings are "(1) judicial in nature, (2) implicate important state interests, and (3) offer an adequate opportunity for review of constitutional claims, (4) so long as no extraordinary circumstances—like bias or harassment—exist which auger against abstention," federal courts are required to abstain. *FreeEats.com v. Indiana*, 502 F.3d 590, 596 (7th Cir. 2007) (quoting *Majors v. Engelbrecht*, 149 F.3d 709, 711 (7th Cir. 1998)). As to the third factor, the availability of subsequent judicial review is sufficient opportunity for

27

review of constitutional claims. *Majors v. Engelbrecht*, 149 F.3d 709, 713 (7th Cir. 1998). If the criteria are met, *Younger* abstention is mandatory and "absolute." *Trust & Inv. Advisers, Inc. v. Hogsett*, 43 F.3d 290, 294 (7th Cir. 1994).

### b. Analysis

*Younger* doesn't require abstention at the motion to dismiss stage for the same reasons that it's premature to declare the state remedy as being "plain, speedy and efficient" for purposes of the Tax Injunction Act. As alleged, it's not and the face of the complaint belies the assertions made by the Secretary. So, it follows that—as alleged—the ongoing proceedings fail to offer an adequate opportunity for review of constitutional claims.

As alleged, the procedurally unconstitutional setting of the administrative review can't be said—at this stage—to afford an adequate forum to air constitutional claims. It's been nearly five years and only just now is the Secretary beginning to act in a manner that could ultimately receive subsequent judicial review. *Engelbrecht*, 149 F.3d at 713. Much of the conduct aggrieved by FBC occurred without this review available. Moreover, continuing to hang over this analysis again remains the legal implications of FBC's freshly revoked license to conduct business. It can't be said at this stage with any confidence that FBC will be afforded subsequent judicial review if it can't maintain a civil action. The Court declines to find *Younger* abstention appropriate at this time.

28

### ii. *Colorado River*

#### a. *Legal Standard*

Second, principles unrelated to proper constitutional adjudication may nonetheless compel an "exceptional" form of abstention in cases of contemporaneous exercises of jurisdiction. *Colorado River*, 424 U.S. at 817-18. These principles rest on considerations of "[w]ise judicial administration … conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 817 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)). Before abstaining under this doctrine, the Court must first decide "whether the state and federal court actions are parallel." *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014).

State and federal proceedings need not be identical to be parallel. *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498-99 (7th Cir. 2011) ("Precisely formal symmetry is unnecessary."). Suits are parallel when "substantially the same parties are contemporaneously litigating *substantially* the same issues in another forum." *Freed*, 756 F.3d at 1019 (emphasis added). "The question is not whether the suits are formally symmetrical, but whether there is a 'substantial likelihood' that the … litigation [in the other forum] will 'dispose of all claims presented in the federal case.'" *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) (quoting *Day v. Union Mines, Inc.*, 862 F.2d 652, 656 (7th Cir. 1988); *Lumen*, 780 F.2d at 695). *See also Freed v. Friedman*, 215 F.Supp.3d 642, 649 (N.D. Ill. 2016).

If they are parallel, then ten non-exclusive factors are weighed: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal

forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence of absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim. *Id.* (citing *Tyrer v. City of South Beloit, Ill.*, 456 F.3d 744, 754 (7th Cir. 2006)). No single factor is determinative and all factors must be carefully weighed to decide whether circumstances warrant abstention. *Freed*, 756 F.3d at 754; *Colorado River*, 424 U.S. at 818-19.

### b. Analysis

Relative to *Younger*, *Colorado River* paints a different picture. The actions occurring here and in state court are clearly parallel and the ten-factor analysis favors abstention.

Although FBC contends—and is correct—that different claims are brought here compared to the state court proceeding, that doesn't foreclose the possibility that the matters are nonetheless parallel. Here, ongoing state litigation between the exact same parties are seeking to resolve questions of law as to FBC's status and activities in relation to Illinois law, determine the appropriate calculation of the PIC according to Illinois law, determine the appropriate statute of limitations according to Illinois law, and determine the validity of FBC's licensure revocation according to Illinois law. The answers to these questions would go a *significant* way toward resolving the claims presented in the federal case, regardless of the answer reached.

A state court declaration that FBC is a banking corporation exempt from the franchise tax may moot the entire federal case. Likewise, a declaration that the statute of limitations is seven years, or that the aggregation rule is the appropriate method of calculating a franchise tax debt, likely resolves many of the issues of this case. Alternatively, if the state court case were denied in whole for reason of the Secretary following the APA appropriately in its enactment of these changes, it too would largely moot this case in favor of the Secretary. If nothing else, if this Court were to maintain this action it would result in substantial duplication of effort in navigating thorny issues of state law. This speaks volumes about the parallel nature of the state matter.

Moving to the ten-factor analysis, the totality of the factors favor abstention by the federal court. Although some factors don't apply, as there is no physical property for the state court to take jurisdiction of, the litigation was commenced on the same day, and neither case has really left its respective starting gate; and other factors weigh against abstention, as the Court finds no inconvenience to either party in the Western Division and the nature of the federal claim is not vexatious; the meat and potatoes of the analysis leads to a conclusion that exceptional circumstances apply and abstention is appropriate.

Messy piecemeal litigation would inevitably occur if both federal and state litigation were to proceed in parallel fashion. How can this Court decide if the statute of limitations violates the Fourteenth Amendment without first determining the appropriate statute of limitations to apply? Or how can the Secretary violate the

31

Eighth Amendment if the BCA doesn't even apply to FBC? These questions are preliminary in nature, but necessary, and have already been posed to a more appropriate forum. The BCA is an Illinois state law that Illinois state courts should be given the opportunity to analyze first. Although the federal court is an available forum for FBC to litigate its federal rights, so too is the state court. Abstention will not prejudice FBC's federal rights.

Ultimately, addressing each factor and considering both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise, the Court is compelled to abstain. *Colorado River*, 424 U.S. at 818-19.

### iii. *Brillhart-Wilton & Discretionary Abstention*

#### a. *Legal Standard*

Finally, notwithstanding *Colorado River*, the Supreme Court has held in *Brillhart* and *Wilton* that district courts possess substantial discretion in deciding whether to declare rights of litigants and may stay or dismiss an action in favor of an ongoing state court case. *Envision*, 604 F.3d at 983; *Brillhart*, 316 U.S. at 494-95; *Wilton*, 515 U.S. at 288. There is no set criteria for when a court should exercise its discretion to abstain, but the "classic example" occurs when solely declaratory relief is sought and parallel state proceedings are ongoing. *Envision*, 604 F.3d at 983; *R.R. St. & Co., Inc. v. Vulcan Materials Co.*, 569 F.3d 711, 715 (7th Cir. 2009).

The Seventh Circuit has identified four factors to consider: (1) whether the declaratory suit presents a question distinct from the issues raised in the state court proceeding, (2) whether the parties to the two actions are identical, (3) whether going

32

forward with the declaratory action will serve a useful purpose in clarifying the legal obligations and relationships among the parties or will merely amount to duplicative and piecemeal litigation, and (4) whether comparable relief is available to the plaintiff seeking a declaratory judgment in another forum or at another time. *Nationwide Ins. v. Zavalis*, 52 F.3d 689, 692 (7th Cir. 1995).

Beyond *Brillhart-Wilton*, the text of the Declaratory Judgment Act itself presents a last escape hatch—not as a matter of abstention but purely discretion—to a federal district court: "… any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration …" 28 U.S.C. § 2201 (emphasis added); *Envision*, 604 F.3d at 986.

### b. Analysis

Even if *Colorado River* abstention weren't appropriate, the Court would nonetheless find it appropriate in its discretion to abstain under the *Wilton-Brillhart* doctrine. With the doctrine's grant of substantial deference to this Court, the Court finds at least three factors strongly favor discretionary abstention. *Zavalis*, 52 F.3d at 692. Although again, FBC is correct that this matter is distinct from the state court matter, there's too much overlap to effectively administer justice simultaneously. The parties are identical. Going forward with this action now would not only fail to serve a useful purpose in clarifying legal obligations, it would *actively harm* the state court's goals in effective statutory interpretation and making determinations of law as applied to FBC. And beyond comparable relief, *better* relief is available in the state

33

court setting. The state court could moot the entire matter with a finding that the franchise tax doesn't apply to FBC.

FBC's contention that *Wilton-Brillhart* requires that the parallel state court proceeding present "the same issues, *not governed by federal law*, between the same parties" is ordinarily true. *Wilton*, 515 U.S. at 288 (emphasis added). But the "same issues" at hand here are *not* the federal constitutional claims brought by FBC in this matter. Instead, they are the underlying web of state law issues that must be preliminarily resolved to effectively make sense of the constitutional dilemma that's been presented.

In plain language, the Court looks at this case and sees a mess. Two highly sophisticated parties each have strong and compelling cases regarding a highly complex area of Illinois law with tens of millions of dollars at stake. As the Court diligently untangled the mess as best it could to construct this Order, the Court saw that underlying it all and sitting at the root of the dispute lies important matters of state statutory interpretation and administrative policy as applied to a prominent longstanding Illinois business. Although this Court is plenty capable of resolving those questions—it's a task it performs every day—this is a task far better reserved for the state courts, especially when a parallel proceeding has already been initiated. And abstention doctrines implore the Court to allow that to occur.

## VI. Conclusion

When abstention is appropriate under *Colorado River*, the Seventh Circuit has a strong preference for a stay, rather than a dismissal of the federal suit. *Adkins v.*

34

*VIM Recycling, Inc.*, 644 F.3d 483, 503 n.9 (7th Cir. 2011). So, in making its decision today, the Court will not outright deny FBC its day in federal court. It's adequately pleaded allegations that would give it the requisite standing to be here.[12] But it will postpone that day to a more appropriate time. After the state court case has run its course, the parties are invited back to paint a new, more complete picture of their dispute. And at that time, the Court will be prepared to act appropriately.[13]

For the above reasons, the motion to dismiss [20] is denied and the matter is STAYED pending the resolution of the proceedings pending in Champaign County Circuit Court, Case No. 2025-MR-283. In the meantime, the Court appreciates FBC's apparent willingness to engage in Alternative Dispute Resolution with this Court. *See* Response [28] at n.15.[14] Should the parties desire a settlement conference with either a Magistrate Judge or the undersigned, they are encouraged to request as much. The parties are directed to file a written status report on the status of that state court case, as well as their desire to engage in mediation, by June 12, 2026.

Date: May 21, 2026

By: _____

Iain D. Johnston
United States District Judge

---

[12] Of course, FBC is also entitled also to take its ball and go home if it so chooses. With the leave of the state court, nothing stops FBC from bringing its federal questions in the state court setting and voluntarily terminating this action.

[13] In addition to being more informed about the nature of the case, the Court also anticipates being able to make a more informed decision on the applicability of the Tax Injunction Act and *Younger* abstention—which may ultimately require the Court to dismiss the action—at that time as well.

[14] The Court finds less persuasive the contention that the matter was filed here because the Western Division is geographically closer to FBC's Leawood, Kansas headquarters. It's technically true, as the Stanley J. Roszkowski Federal Courthouse in Rockford sits 497 driving miles away from FBC's headquarters, compared to 526 driving miles from the Dirksen Courthouse in Chicago. But it blinks reality that anybody would make that drive. Instead, they'd fly to O'Hare and then either drive 30 miles to downtown Chicago or 60 miles to Rockford. The time spent driving in either direction is practically the same.